[DO NOT PUBLISH]

# In the
# United States Court of Appeals
## For the Eleventh Circuit

_____

No. 23-10619

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

JONATHAN ANTHONY REID,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 2:20-cr-00084-SPC-NPM-1

_____

Before ROSENBAUM, BRASHER, and ABUDU, Circuit Judges.

PER CURIAM:

Jonathan Reid appeals his conviction and sentence for possession of a firearm by a convicted felon under 18 U.S.C. § 922(g)(1). He raises six arguments that the district court committed reversible errors at trial, three arguments against his Armed Career Criminal Act sentence enhancement, and two arguments challenging the constitutionality of section 922(g)(1). Each argument fails. Accordingly, we affirm the conviction and sentence.

## I.

On March 11, 2021, a jury convicted Reid of knowingly possessing a firearm as a convicted felon in violation 18 U.S.C. § 922(g)(1). The following facts were submitted as evidence at trial.

On January 29, 2020, at about 1:15 am, two victims were shot at Babe's nightclub. Surveillance footage captured the shooting as it unfolded. The footage revealed two individuals speaking in front of Babe's when a silver Kia arrived. An unidentified person wearing a hooded sweatshirt, a ski mask, and a blue glove emerged from the car and approached the individuals. The unidentified person fired a gun at the two individuals, wounding them both. The victims both fled before the shooter returned to his car and traveled westbound.

Shortly after the shooting, law enforcement began investigating and looking for the suspect. A detective soon arrived at the

scene where he collected nine shell casings, five bullets, and one live round of ammunition. As the detective was investigating the scene, an officer saw a silver Kia matching a description of the suspect's car and began to follow it. When the officer eventually caught up to the car, it drifted to the side of the road and crashed. The officer then pursued the suspect on foot, but he failed to apprehend him. Law enforcement then impounded the car and secured a search warrant for the vehicle.

At the impound lot, officers searched the car. There, they found Reid's driver's license, a ski mask, three cellphones including a pre-paid cellphone, a sweatshirt, a paycheck for "Reid J," a rental car receipt indicating that the car was rented to Reid, and a fanny pack containing blue latex gloves, a gun, and ammunition. Each of these items was tied directly to Reid or the crime. A manager for the rental car company later confirmed that Reid rented a silver Kia Optima on January 24 that was scheduled to be returned on January 29. Store surveillance footage captured Reid purchasing the pre-paid phone. Cell tower records indicated that the three phones were "close in proximity" to Babe's at the time of the shooting. And testing later confirmed that the shell casings from the crime scene were fired from the gun found in the car, fingerprints on the pre-paid phone belonged to Reid, and Reid was the "major profile" or "number one contributor" of DNA found on each item, including the gun. Reid later stipulated that the gun "was manufactured outside the state of Florida and was subsequently moved into the State of Florida."

ATF Special Agent Ivan Kovacevich assisted in the investigation and testified about his involvement at trial. According to Kovacevich, he and three other officers interviewed Reid. During the interview, Reid said that he rented the silver Kia, but that it had been abandoned and likely stolen. When asked about the three cellphones found in the car, he admitted to owning two of them but denied owning the pre-paid phone. Kovacevich did not know why Reid denied owning the pre-paid phone, but he theorized that Reid purchased the phone as a "drop phone," used it to "contact[ ] another individual who was present at the location arranging for the shooting to take place," and intended to discard it after the shooting. When asked for the passcode to unlock his phones, Reid refused. He also denied owning the ski mask, sweatshirt, fanny pack, and gun that were found in the car.

At trial, the government asked Kovacevich about a tattoo on Reid's stomach that resembled elements of the crime. Specifically, the tattoo depicted "a person wearing a ski mask holding two smoking semiautomatic handguns that look nearly identical to the [gun] brandished in this case." Reid objected to this evidence as having "zero relevance" and "zero probative value." He argued that it was "not a predicter of [']now I'm going to start shooting people at Babe's because I have a tattoo.[']" But the government insisted that it intended to use the tattoo to prove identity because of the similarities between the tattoo and the shooter captured on video. The court allowed the government to submit evidence of the tattoo and instructed the jury that it could consider the evidence "for the limited purpose of deciding an identity" but "must

not consider this evidence to decide if the defendant engaged in the activity alleged in the indictment."

The government also introduced evidence of Reid's prior conviction under Fla. Stat. § 790.23 for possessing a firearm as a convicted felon. Reid objected to the submission on the basis that he already stipulated to being a convicted felon which is an element of his charged offense. But the court allowed the submission along with an instruction that the jury could consider the prior conviction "to decide whether the defendant had the state of mind or intent necessary to commit" the present offense, but it could not rely on the conviction "to decide if the defendant engaged in the activity alleged."

At closing arguments, the prosecutor summarized the government's case against Reid. The prosecutor recounted the DNA analysis, cellphone records, and witness testimony, and he replayed the surveillance footage that captured the shooting. While playing the footage, he also stated that "you can see . . . the defendant getting out [of the car,] . . . the defendant getting back into the silver vehicle[,] . . . here he is exiting [the scene,] . . . [a]nd he is, in fact, turning left[.]" Reid maintains that surveillance footage was not clear and was devoid of "any evidence that [the suspect] resembled [him.]" After closing, the jury found Reid guilty.

The court proceeded to sentencing. The government filed a PSI in which it sought several sentence enhancements. Most relevant of these enhancements was the armed career criminal enhancement. According to the PSI, Reid was eligible for an armed

career criminal enhancement under U.S.S.G. § 4B1.4 "because the instant offense of conviction is a violation of 18 U.S.C. § 922(g), and the defendant has at least three prior convictions for a violent felony or serious drug offense, or both, that were committed on occasions different from one another." Those prior convictions included aggravated assault on November 9, 2012; sale of cocaine on November 16, 2012; and sale of a controlled substance and possession of heroin with intent to sell on March 19, 2018. At sentencing, the court read these facts and recognized that Reid made "no objection." The court even afforded Reid another opportunity to object, but he did not. Reid filed proposed objections to the PSI, but he did not deny that he committed three violent felonies or serious drug offenses on three separate occasions. The court then adopted the PSI calculations and applied the armed career criminal enhancement. Ultimately, the court sentenced Reid to life imprisonment to run concurrent to any anticipated state sentence with five year's supervised release.

Reid timely appealed.

## II.

Several standards of review govern our analysis. We review a district court's evidentiary rulings for an abuse of discretion. *United States v. Brown*, 665 F.3d 1239, 1247 (11th Cir. 2011). When a defendant challenges an evidentiary ruling or asserts a claim for prosecutorial misconduct for the first time on appeal, we review for plain error. *United States v. Calderon*, 127 F.3d 1314, 1334 (11th Cir. 1997) (for unpreserved evidentiary challenges); *United States v.*

*Frank*, 599 F.3d 1221, 1238 (11th Cir. 2010) (for unpreserved prosecutorial misconduct challenges). We review the "cumulative impact of multiple evidentiary and instructional errors" *de novo*. *United States v. Dohan*, 508 F.3d 989, 993 (11th Cir. 2007). We review unobjected to enhancements under the ACCA for plain error. *United States v. Edwards*, 142 F.4th 1270, 1279 (11th Cir. 2025); *United States v. Laines*, 69 F.4th 1221, 1233 (11th Cir. 2023). Finally, when a defendant challenges the constitutionality of the statute of conviction for the first time on appeal, we review for plain error. *United States v. Wright*, 607 F.3d 708, 715 (11th Cir. 2010).

### III.

Reid's appeal proceeds in three phases. First, he argues that his conviction should be reversed due to a series of supposed trial errors. Next, he argues that his sentence should be vacated because he does not have three predicate offenses to warrant an enhancement, and that even if he did, a jury did not find that he committed these offenses on three separate occasions as required by 18 U.S.C. § 924(e). Finally, he argues that section 922(g)(1) is unconstitutional under the Commerce Clause and the Second Amendment. We reject each of these arguments.

### A.

Reid begins by challenging his conviction. Specifically, he argues that the district court committed several reversible errors by (1) admitting as evidence his tattoo depicting a man in a ski mask wielding two semi-automatic pistols; (2) admitting as evidence his

prior conviction for possession of a firearm by a convicted felon; (3) allowing testimony that he refused to give his phone passcode to law enforcement; (4) allowing opinion testimony about why he owned a pre-paid cell phone; (5) allowing the government to identify him on surveillance footage during closing arguments even though the identity of the man on camera had not been proven; and (6) depriving him of a fair trial through the cumulative effect of these errors. Upon review, we determine that the district court did not commit any errors, so we cannot reverse for cumulative error. Therefore, we affirm his conviction.

1.

First, Reid argues that the district court abused its discretion by admitting as evidence his tattoo depicting a person in a ski mask holding two smoking pistols over his objection. According to Reid, the government used the tattoo "to show propensity" and that he "had a hostile, criminal disposition." Therefore, the probative value was substantially outweighed by undue prejudice. But the government did not introduce evidence of a prior bad act to prove propensity. It introduced evidence of a tattoo that resembled elements of the crime to prove identity. And the district court gave the jury a limiting instruction on the proper use of this evidence. As a result, we cannot say that the decision to admit the evidence was an abuse of discretion.

Reid initially argues that the evidence was inadmissible as a prior bad act. According to Rule 404(b) of the Federal Rules of Evidence, "[e]vidence of any other crime, wrong, or act is not

admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," although it may be admissible "for another purpose" such as to prove identity. But Reid's tattoo is not a "act"; it is a physical feature. As such, Rule 404(b) is inapplicable.

Instead, we should look to Rule 403 and Rule 404(a). Under Rule 403, the court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. We have emphasized that "the trial judge is accorded the broadest discretion in determining whether evidence should be excluded under Rule 403." *United States v. Costa*, 947 F.2d 919, 924 (11th Cir. 1991) (quotation marks omitted). Thus, when reviewing decisions under Rule 403, we "look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." *United States v. Lopez*, 649 F.3d 1222, 1247 (11th Cir. 2011) (quotation marks omitted). Even if evidence is admissible under Rule 403, it cannot be used as improper character evidence under Rule 404(a). *See* Fed. R. Evid. 404(a) ("Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait."). Applying these rules, the district court did not abuse its discretion.

The court reasonably concluded that the tattoo was relevant and probative to the shooter's identity and that its relevance was not substantially outweighed by the risk of unfair prejudice in light of its limiting instruction to the jury that it could not consider the

tattoo as character evidence. Specifically, the tattoo depicted "a person wearing a ski mask," just like the shooter, who was "holding two smoking semiautomatic handguns that look nearly identical" to the handgun used in this case. Because the identity of the shooter was "likely the most important issue for the jury to decide," the tattoo was especially relevant. And to "ameliorate any prejudice" that may result from the admission, the court offered a limiting instruction to the jury that it could consider the tattoo only "for the limited purpose of deciding an identity," but not whether Reid "engaged in the activity alleged in the indictment." In light of these circumstances, "the probative value and government need for this evidence were strong, [and] any unfair prejudice possibly caused by its introduction was mitigated by the trial judge's limiting instructions." *United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1225 (11th Cir. 1993); *United States v. Ramirez*, 426 F.3d 1344, 1354 (11th Cir. 2005) ("Moreover, the risk of undue prejudice to [the defendant] was reduced by the court's limiting instruction."). Consequently, the district court did not abuse its discretion.

2.

Next, Reid challenges the admissibility of his prior conviction. He argues that the admission was unduly prejudicial because he already stipulated that he knew his status as a convicted felon and there were no other purposes for which the conviction could have been relevant evidence. Therefore, the government introduced the conviction as a prior bad act used to show "bad character or propensity" for the crime. But the government properly relied

on the prior conviction to prove intent at trial. As a result, the district court did not abuse its discretion by allowing the evidence over Reid's objection.

Under Rule 404(b)(2), the government can rely on evidence of prior bad acts to prove intent. Fed. R. Evid. 404(b)(2). To be admissible under this rule, the evidence must satisfy three conditions: (1) it must be relevant to an issue other than the defendant's character; (2) there must be sufficient evidence to allow a jury to find by a preponderance of the evidence that the defendant committed the prior bad act; and (3) any undue prejudice associated with the prior bad act must not substantially outweigh the probative value. *United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007). The government satisfied each of these conditions, so admission was proper.

Applying the first condition, intent was a material issue in this case. To sustain a conviction under 18 U.S.C. § 922(g), the government must prove "*both* that the defendant knew he possessed a firearm *and* that he knew he belonged to the relevant category of persons barred from possessing a firearm." *Rehaif v. United States*, 588 U.S. 225, 237 (2019) (emphasis added). A defendant makes his intent a material issue by pleading not guilty to the offense, although he can "remove intent as an issue and prevent the introduction of Rule 404(b) evidence by stipulating that [he] had the required intent." *United States v. Cenephat*, 115 F.4th 1359, 1366 (11th Cir. 2024). True, Reid stipulated that he "knew of his status as a convicted felon," but he pleaded not guilty. As a result, he

conceded that he "knew he belonged to the relevant category of persons barred from possessing a firearm," but whether he "knew he possessed a firearm" remained a disputed issue. *See Rehaif*, 588 U.S. at 237.

The prior conviction was relevant to proving intent. A prior conviction can be relevant evidence of intent "where the state of mind required for the charged and extrinsic offenses is the same." *Edouard*, 485 F.3d at 1345. And under Fla. Stat. § 790.23, the crime for which Reid was previously convicted, the government must prove two elements: felony status and "knowingly owning or having a firearm in one's care, custody, possession or control." *Hines v. State*, 983 So. 2d 721, 724 (Fla. 1st Dist. Ct. App. 2008). Therefore, both the prior conviction and the present offense require knowing possession of a firearm. And we have previously recognized a "logical connection between a convicted felon's knowing possession of a firearm at one time and his knowledge that a firearm is present at a subsequent time (or, put differently, that his possession at the subsequent time is not mistaken or accidental)." *United States v. Jernigan*, 341 F.3d 1273, 1281 (11th Cir. 2003), *abrogated in part on other grounds by Rehaif*, 588 U.S. 225. Therefore, Reid's prior conviction was relevant to proving intent in the instant matter.

Under the second condition, there must be sufficient proof for a jury to find by a preponderance of the evidence that Reid previously possessed a firearm as a convicted felon. *See Edouard*, 485 F.3d at 1344. "It is elementary that a conviction is sufficient proof that [the defendant] committed the prior act," and whether the

conviction was the result of a jury verdict or guilty plea is "inconsequential." *Calderon*, 127 F.3d at 1332. Because Reid previously pleaded guilty to and was convicted of unlawful possession of a firearm by a felon, the jury could have reasonably determined that he previously possessed a firearm as a convicted felon.

Under the third condition, the unfair prejudice of the prior act must not substantially outweigh its probative value. *Edouard*, 485 F.3d at 1344. And under the broad discretion afforded to the district court on matters of admissibility, we cannot say that the potential prejudice outweighed the probative value. *See Costa*, 947 F.2d at 924; *Lopez*, 649 F.3d at 1247. As mentioned earlier, we have previously recognized the "logical connection between a convicted felon's knowing possession of a firearm at one time and his knowledge that a firearm is present at a subsequent time." *Jernigan*, 341 F.3d at 1281. And to minimize the potential unfair prejudice, the district court twice instructed the jury that it "may consider this evidence to decide whether the defendant has the state of mind or intent necessary to commit the crime," but it could not consider the evidence to "decide if the defendant engaged in the activity alleged in the indictment." *See Ramirez*, 426 F.3d at 1354 (potential prejudice can be reduced by curative instruction). Due to the probative value of the prior conviction and the diminished potential prejudice in light of the instruction, the district court did not abuse its broad discretion by admitting evidence of the prior conviction.

3.

Reid's third argument against his conviction is that the court reversibly erred by allowing Kovacevich to testify that Reid refused to provide the passcode to his phones. According to Reid, his failure to provide his passcode was a "comment on his right to refuse, similar to a comment on the right to silence under the Fifth Amendment," and allowing this testimony was "inherently prejudicial error." He acknowledges that he did not raise this issue below, so we review for plain error. *See Calderon*, 127 F.3d at 1334. And under this standard, we cannot say the court erred.

Under plain error review, the defendant has the burden of showing that (1) there was error, (2) that was plain, (3) that affected the defendant's substantial rights, and (4) that seriously affected the fairness, integrity, or public reputation of judicial proceedings. *United States v. Monroe*, 353 F.3d 1346, 1349 (11th Cir. 2003). An error is plain if the legal rule is "clearly established at the time the case is reviewed on direct appeal." *United States v. Moore*, 22 F.4th 1258, 1266 (11th Cir. 2022) (quotation marks omitted). "Where the explicit language of a statute or rule does not specifically resolve an issue," there can be no plain error unless "precedent from the Supreme Court or this Court directly resolv[es] it." *Id.* (citation omitted).

Reid did not satisfy his burden of showing that allowing Kovacevich's testimony constituted plain error. Reid does not expressly identify what law the testimony may violate, but he alludes generally to the Fourth and Fifth Amendments. The Fourth

Amendment protects "[t]he right of the people . . . against unreasonable searches and seizures," and the Fifth Amendment protects individuals from being "compelled in any criminal case to be a witness against himself." By looking solely at the "explicit language" of these amendments, there is no way to tell how they would apply to a defendant's refusal to unlock his phone for law enforcement. *See Moore*, 22 F.4th at 1266. And Reid does not cite any relevant authorities to illustrate the alleged error. Instead, he points to out-of-circuit and state decisions that suggest this testimony was improper. The only Eleventh Circuit case he cites is an unpublished decision that he admits "[did] not squarely address the issue." *See United States v. Rio*, 443 F. App'x 433, 438 & n.2 (11th Cir. 2011). In that case, we recognized that there was "no case law that squarely answers the question," acknowledged a split among our sister circuits, and avoided deciding it ourselves.

Reid bears the burden of demonstrating plain error, and because he failed to identify explicit language or a relevant decision that resolves this matter, he failed to satisfy that burden. Therefore, we cannot say the district court plainly erred.

4.

Fourth, Reid argues that the district court erred by allowing Kovacevich to share his theory that Reid used the pre-paid cell-phone as a "drop phone" to "contact[ ] another individual who was present at the location arranging for the shooting to take place." According to Reid, Kovacevich essentially testified that he believed Reid "called someone inside to draw out [the victim]," which is

"tantamount to advising the jury [that] he is guilty." Reid recognizes that he did not raise this issue at trial, so we review for plain error. *See Calderon*, 127 F.3d at 1334.

At the outset, we must examine the basis of Kovacevich's opinion to determine whether it is lay or expert. *United States v. Gbenedio*, 95 F.4th 1319, 1332 (11th Cir. 2024). Although the line between the two may blur "when testimony is based on professional work," we have previously held that a witness may offer lay testimony "based on his professional experiences as long as the testimony is rationally based on those experiences, rather than on scientific or technical knowledge." *Id.* (citation omitted). Kovacevich's testimony was not based on any technical knowledge, but instead on his five years of experience as an ATF special agent, five years of experience as a police officer, and his own involvement in the investigation into the shooting. As a result, Kovacevich's testimony was lay opinion testimony governed by Rule 701 of the Federal Rules of Evidence.

We cannot say the district court plainly erred under Rule 701. Under Rule 701, opinion testimony must be "rationally based on the witness's perception," "helpful . . . to determining a fact in issue," and "not based on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701. Each condition was arguably met. As previously mentioned, Kovacevich's testimony was based on his own career experience instead of technical or scientific knowledge. He developed this theory based on what he learned "[d]uring the course of [his] investigation." And this testimony was offered only

after Reid's counsel elicited testimony that Kovacevich "[didn't] know why [Reid] [was] lying about [owning] the third phone."

Reid argues that the opinion was nevertheless improper under our decision in *United States v. Hawkins*, 934 F.3d 1251 (11th Cir. 2019). There, we held that an agent's testimony "went far beyond permissible testimony" and constituted plain error when the agent offered "speculative interpretive commentary on the meanings of phone calls and text messages and gave his opinions about what was occurring during and in between those communications." *Id.* at 1261. But unlike here, in *Hawkins*, the "Government's case hinged on [the agent's] extensive testimony." *Id.* at 1266. And unlike Kovacevich, the agent in *Hawkins* "'interpreted' unambiguous language, mixed expert opinion with fact testimony, and synthesized the trial evidence for the jury." *Id.* He was also "presented as an expert to the jury," and his testimony "strayed into speculation and unfettered, wholesale interpretation of the evidence." *Id.* Due to these dissimilarities, *Hawkins* is inapplicable to the matter before us, and the district court did not plainly err.

5.

Fifth, Reid argues that the prosecutor's comments identifying him as the person exiting the car in surveillance footage constituted prosecutorial misconduct because "there was no evidence or testimony" to support this statement, the prosecutor "improperly conveyed to the jury that [he] knew [Reid] was the person in the video," and "the sole issue in this case was the identity of the

driver/shooter." Reid did not raise this issue below, so we review for plain error. *See Frank*, 599 F.3d at 1238.

A prosecutor's remarks amount to misconduct when the remarks are "improper" and "prejudicially affect the substantial rights of the defendant." *United States v. Eyster*, 948 F.2d 1196, 1206 (11th Cir. 1991). Remarks can be improper if the prosecutor "materially misstate[s] the facts shown by the evidence." *United States v. Goldstein*, 989 F.3d 1178, 1199 (11th Cir. 2021). "[A]lthough a prosecutor may not exceed the evidence presented at trial during her closing argument, she may state conclusions drawn from the trial evidence." *United States v. Reeves*, 742 F.3d 487, 505 (11th Cir. 2014). And "[a] defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different." *United States v. Eckhardt,* 466 F.3d 938, 947 (11th Cir. 2006). We generally consider four factors in determining whether a defendant's substantial rights are prejudicially affected, including whether (1) "the challenged comments had a tendency to mislead the jury or prejudice the defendant;" (2) "the comments were isolated or extensive;" (3) "the comments were deliberately or accidentally placed before the jury;" and (4) "the strength of the competent proof establishing the guilt of the defendant." *Reeves*, 742 F.3d at 505. When we assess these factors, "comments in closing statement must be viewed in the context of the trial as a whole." *Id*.

Even if we assume the comments were improper, they did not prejudice Reid's substantial rights. True, the comments may

have satisfied the first and third factors, given that Reid's identity as the shooter was not proven and that the comments made during closing were likely intentional. But they did not satisfy the other two factors. Specifically, the comments were not extensive; the prosecutor briefly identified Reid as the person in the surveillance video amid summarizing the government's entire case against him, including DNA analysis, witness testimony, and cellphone records. And the proof establishing Reid's guilt is relatively strong, as the government presented overwhelming DNA evidence that Reid had worn the items seen on the surveillance footage that were recovered from a car that he rented and handled the gun used in the crime, as well as evidence that his cellphones were in the vicinity at the time of the shooting. Under plain error review and in the context of the trial as a whole, the prosecutor's comments made at closing did not prejudicially affect Reid's substantial rights.

6.

Reid's final argument against his conviction is that the cumulative effect of the aforementioned supposed errors deprived him of a fundamentally fair trial. Under the cumulative error doctrine, we reverse a conviction if the aggregation of individually nonreversible errors results in the denial of the defendant's right to a fair trial. *United States v. Leonard*, 4 F.4th 1134, 1147 (11th Cir. 2018). But there can be no cumulative error "[w]here there is no error or only a single error." *United States v. Gamory*, 635 F.3d 480, 497 (11th Cir. 2011). Therefore, because the district court did not

err under any of Reid's arguments, we cannot reverse his conviction for cumulative error.

### B.

Next, Reid challenges his sentence. The district court determined that Reid was an armed career criminal under the ACCA and subject to a sentence enhancement under U.S.S.G. § 4B1.4. A defendant is an armed career criminal if he violates 18 U.S.C. § 922(g) and has three previous convictions "for a violent felony or a serious drug conviction, or both, committed on occasions different from one another." 18 U.S.C. § 924(e)(1); U.S.S.G. § 4B1.4. Reid argues that his sentence must be vacated because the jury did not find that he committed three predicate offenses on different occasions and because his prior convictions were not predicate "violent felon[ies]" or "serious drug offense[s]." 18 U.S.C. § 924(e). He did not challenge any of these issues below, so we review for plain error. *Edwards*, 142 F.4th at 1279, 1281; *Laines*, 69 F.4th at 1233. And upon review, the district court did not plainly err on any of these matters.

### 1.

First, Reid argues that the failure to submit his prior convictions to the jury to find that he was convicted of three predicate offenses on three separate occasions was a structural error requiring automatic reversal under *Erlinger v. United States*, 602 U.S. 821 (2024). *See United States v. Troya*, 733 F.3d 1125, 1134 (11th Cir. 2013) ("Trial errors are subject to harmless error review, whereas

23-10619                Opinion of the Court                21

structural errors require automatic reversal."). In *Erlinger*, the Supreme Court held that "judicial factfinding by a preponderance of the evidence that a defendant has three ACCA predicate convictions committed on different occasions" violates the Fifth and Sixth Amendments. *United States v. Rivers*, 134 F.4th 1292, 1305 (11th Cir. 2025) (citing *Erlinger*, 602 U.S. at 830). But we recently determined that such a violation was not a structural error and therefore not entitled to automatic reversal. *Id*.

The court did not plainly err by finding that the different occasions requirement was satisfied because Reid conceded that he was convicted of three predicate offenses on three separate occasions. According to the PSI, Reid had "at least three prior convictions for a violent felony or serious drug offense, or both, that were committed on occasions different from one another." Specifically, he committed aggravated assault on November 9, 2012; sold cocaine on November 16, 2012; and sold a controlled substance and possessed heroin with intent to sell or deliver on March 19, 2018. Reid did not object to these facts either before or during the sentencing hearing. When a defendant fails to object to specific facts contained in a PSI, he "waive[s] any objections and effectively admit[s] to the recited facts for sentencing purposes." *United States v. Harris*, 941 F.3d 1048, 1053 (11th Cir. 2019). In light of this concession, the district court did not plainly err.

2.

Next, Reid argues that his aggravated assault conviction was not a violent felony under the ACCA because at the time of

conviction, Florida courts were divided on whether aggravated assault could be committed recklessly. *See Borden v. United States*, 593 U.S. 420, 423 (2021) (holding that a reckless offense cannot qualify as a "violent felony" under the ACCA). This argument is foreclosed by our precedent.

Under the ACCA, a "violent felony" is any crime punishable by more than one year in prison involving "the use, attempted use, or threatened use of physical force against the person of another." 18 U.S.C. § 924(e)(2)(B)(i). To determine whether a state crime qualifies as a "violent felony," we employ the categorical approach. *United States v. Jones*, 906 F.3d 1325, 1327–28 (11th Cir. 2018). Under this approach, we look only to the elements of the prior offense, not the facts underlying the conviction, and determine whether the least culpable conduct criminalized by the statute meets the federal definition of a "violent felony." *Id.* And when we determine the elements of a state offense, we are bound by the state's caselaw defining those elements. *See United States v. Rosales-Bruno*, 676 F.3d 1017, 1021 (11th Cir. 2012).

In *Somers v. United States*, we determined that Florida aggravated assault was a violent felony under the ACCA. 66 F.4th 890, 896 (11th Cir. 2023). In doing so, we recognized the Florida Supreme Court's response to our certified question that "assault under Florida law requires a *mens rea* of at least knowing conduct; it cannot be committed recklessly." *Id.* (citing *Somers v. United States*, 355 So. 3d 887, 892 (Fla. 2022)). And because this interpretation reflects "what the statute always meant," Somers could not "rely on

earlier decisions of Florida's intermediate courts of appeal to avoid this clear holding." *Id.* (quotation marks and citations omitted). Reid acknowledges that this decision is binding precedent yet asks us to revisit it. But under our prior panel precedent rule, we must follow our earlier decision unless it has been abrogated by the Supreme Court, this Court sitting en banc, or a state supreme court on a matter of state law. *Hattaway v. McMillian*, 903 F.2d 1440, 1445 n.5 (11th Cir. 1990). Since there are no such intervening decisions, we are bound to follow *Somers*.

3.

Reid's third argument against his sentence enhancement is that his drug convictions were not "serious drug offenses" under the ACCA because the Florida definitions of "heroin" and "cocaine" are broader than the federal definitions. But his cocaine argument is foreclosed by our precedent, and he points to no caselaw clearly establishing that the Florida definition of heroin is overbroad. Therefore, the district court did not plainly err.

Under the ACCA, a "serious drug offense" is "an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance." § 924(e)(2)(A)(ii). When determining whether a state crime qualifies as a serious drug offense, we again apply the categorical approach. *United States v. Conage*, 976 F.3d 1244, 1250 (11th Cir. 2020). In so doing, we look at "the version of state law that the defendant was actually convicted of violating." *United States v. Jackson*, 55 F.4th 846, 850 (11th Cir. 2022), *aff'd sub nom.*, *Brown v. United States*,

602 U.S. 101 (2024) (quotation marks omitted). Additionally, "the federal controlled-substances schedules in effect at the time of the previous state conviction," rather than those in effect at the time of the federal firearm offense, are used to determine whether a prior state conviction constitutes a serious drug offense. *Id.* at 856. Thus, a "prior state drug conviction constitutes an ACCA predicate if the drugs on the federal and state schedules matched when the state drug offense was committed." *Brown*, 602 U.S. at 119.

Reid argues that the state definitions of "cocaine" and "heroin" are overbroad because they include "any" stereoisomer of cocaine and "any" isomer of heroin, whereas the federal definitions include only the "optical and geometric isomers" of cocaine and the "optical isomer" of heroin. *Compare* Fla. Stat. § 893.03(2)(a)(4) (listing as a controlled substance "[c]ocaine or ecgonine, *including any of their stereoisomers*, and any salt, compound, derivative, or preparation of cocaine or ecgonine") (emphasis added), *and* § 893.03(1)(b)(11) (listing "heroin" and "*any* of [its] salts, isomers, and salts of isomers" when sufficiently present) (emphasis added), *with* 21 U.S.C. § 812(c), Sched. II(a)(4) (listing "cocaine, its salts, *optical and geometric isomers*, and salts of isomers") (emphasis added), *and* § 812(c), Sched. I(b)(10) (listing "heroin," including its "salts, isomers, and salts of isomers," when sufficiently present); § 802(14) (2018) ("The term 'isomer' means *the optical isomer*") (emphasis added). But, as Reid recognizes, we previously rejected this argument under plain error review with regards to cocaine because the defendant "identified no precedent that would make it obvious or clear under current law that the Florida definition of cocaine is

overbroad." *See Laines*, 69 F.4th at 1234 (internal quotation marks omitted). And just like in *Laines*, Reid has identified no precedent that clearly establishes that the Florida definition of either cocaine or heroin is overbroad. As a result, the district court did not plainly err.

## C.

Finally, Reid argues that section 922(g)(1) is unconstitutional under the Commerce Clause and the Second Amendment, facially and as applied. *See* U.S. Const. art. I, § 8, cl. 3; Amend. 2. These arguments fail.

Reid argues that section 922(g) is unconstitutional under the Commerce Clause, facially and as applied, because his firearm possession was completely intrastate. But as even he recognizes, his arguments are foreclosed by our precedents. We have previously determined that section 922(g) is within Congress's Commerce Clause powers. *United States v. Stancil*, 4 F.4th 1193, 1200 (11th Cir. 2021). And we have rejected his as applied theory so long as the firearm previously travelled across state lines. *See, e.g.*, *United States v. McAllister*, 77 F.3d 387, 390 (11th Cir. 1996). Because Reid stipulated that the firearm was "manufactured outside the State of Florida and subsequently moved into the State of Florida," his Commerce Clause argument fails.

Reid also argues that section 922(g) is unconstitutional under the Second Amendment, facially and as applied, because there is no American tradition of disarming convicted felons. And again, Reid acknowledges that these arguments are foreclosed by our

precedents. We have previously concluded that section 922(g)(1) was constitutional under the Second Amendment and that "statutes disqualifying felons from possessing a firearm under any and all circumstances do not offend the Second Amendment." *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010); *see United States v. Dubois*, 139 F.4th 887, 892–94 (11th Cir. 2025) (concluding that neither *United States v. Rahimi*, 602 U.S. 680 (2024), nor *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), abrogated *Rozier*). Therefore, this argument similarly fails.

## IV.

We **AFFIRM**.